******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# GENCONN ENERGY, LLC *v.* PUBLIC UTILITIES REGULATORY AUTHORITY
## (SC 20716)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Moll, Js.

*Syllabus*

Pursuant to statute (§ 16-243u), "in an annual retail generation rate contested case," a peaking generation facility "shall be entitled to recover its prudently incurred costs," and the Public Utilities Regulatory Authority (PURA) "shall review such recovery of costs consistent with the principles set forth in sections 16-19, 16-19b and 16-19e . . . ."

Pursuant further to statute (§ 16-19e (a) (4)), PURA shall examine and review a peaking generation facility's recoverable costs to ensure "that the level and structure of rates be sufficient, but no more than sufficient," to cover the facility's operating costs.

The plaintiff electric supplier, G Co., appealed to the trial court from the final decision of the defendant, PURA, which reduced G Co.'s proposed return on capital with respect to two of G Co.'s peaking generation facilities that were designed to provide additional electric supply to Connecticut consumers at times of increased demand. G Co., as a peaking generation provider, is required to submit its Annual Fixed Revenue Requirements application (application) to PURA every year to set out the recoverable capital it seeks for the upcoming year. In determining the allowable recoverable capital, PURA first determines the peaking generation facility's rate base, which represents the value of the property on which the facility is permitted to earn a rate of return. The rate base is then divided based on the debt-to-equity ratio to find the portion of the rate base that is attributable to each. Finally, the portion of the rate base that is attributable to debt and the portion that is attributable to equity are multiplied by the applicable rate to find the total amount the facility should be allowed to recover. For each of G Co.'s applications for 2010 through 2020, it sought and was allowed to recover, as part of the recoverable capital, its actual annual financing costs. When G Co. submitted its 2021 application, PURA concluded that G Co. was not entitled to recover the entire $8.573 million actual interest expense and determined that a reduction was warranted. PURA found that there were certain inaccuracies in both the debt-to-equity ratio and the debt rate proposed by G Co., and that G Co.'s miscalculations would lead to an overrecovery of costs. PURA's solution was to maintain G Co.'s proposed debt-to-equity ratio but to reduce the debt rate, ultimately reducing G Co.'s recoverable capital by approximately $2.861 million. According to PURA, this result would be more in line with the recovery contemplated by § 16-19e (a) (4), in that the rates paid by consumers would be "sufficient, but no more than sufficient," to cover G Co.'s capital costs. PURA therefore approved G Co.'s 2021 application but only authorized a return on interest of approximately $5.712 million rather than the $8.573 million that G Co. sought. The trial court rendered judgment dismissing G Co.'s administrative appeal, concluding that PURA was authorized to adjust G Co.'s overall recovery as it did. On appeal from the trial court's judgment, G Co. claimed, inter alia, that § 16-243u required PURA to use the statute's specific rate-making methodology applicable to peaking generation and not the general rate-making principles found in § 16-19e, and that the plain language of § 16-243u did not give PURA the authority to lower the recovery of G Co.'s actual annual financing costs. *Held*:

1. The trial court correctly determined that PURA had acted within its statutory authority to lower G Co.'s debt rate in its decision on G Co.'s 2021 application, PURA having acted pursuant to its authority under § 16-243u when it reviewed G Co.'s recovery of costs consistent with the general rate-making principles of § 16-19e:

Because § 16-243u incorporates § 16-19e by reference, the plain meaning

of § 16-243u must be determined by considering § 16-19e alongside of it, and, when the two statutes are considered together, it is clear that § 16-243u directs PURA to review a peaking generation facility's recoverable costs pursuant to § 16-19e (a) (4) to ensure that the rates are "sufficient, but no more than sufficient," to allow a peaking generation facility to cover its operating costs.

Moreover, there was no merit to G Co.'s claim that § 16-243u's reference to § 16-19e authorizes PURA only to consider the principles in § 16-19e for the recovery of costs but not for the setting of rates, as cost recovery and rate setting are interrelated in that a peaking generation facility recovers its costs only through the setting of rates.

Furthermore, G Co.'s contention that PURA must allow a full recovery of costs for any costs that were previously deemed "prudent," without any additional evaluation, would render the language in § 16-243u requiring an "annual retail generation rate contested case" and a review by PURA of "recovery of costs consistent with the principles set forth in [§] . . . 16-19e" meaningless.

In addition, although it was undisputed that PURA previously determined that the interest costs that G Co. had incurred from a 2012 refinancing of its debt were prudent, PURA had the authority, under § 16-243u, to reevaluate and recharacterize costs that were previously deemed prudently incurred in a prior year and to determine that they nevertheless may not properly be recovered from consumers in a subsequent year.

There also was no merit to G Co.'s claim that PURA had violated the plain language of § 16-243u by preventing G Co. from recovering a reasonable rate of return on equity when it disallowed some of G Co.'s recovery of costs and thus effectively reduced the rate of return on equity to less than the amount on which the parties had previously agreed, as the reduction in G Co.'s recoverable capital resulted from a reduction in the debt rate rather than a reduction of the rate of return on equity, and, accordingly, PURA allowed a reasonable rate of return on equity pursuant to the same rate of return on equity that had previously been agreed on by the parties.

This court concluded that G Co.'s interpretation of the statutory scheme, if applied, would leave PURA powerless to fix excess recoveries, which would conflict with the plain meaning of § 16-243u and with the broad authority granted to PURA in § 16-19e to set rates.

2. PURA's action in lowering the debt rate in its decision on G Co.'s 2021 application after not doing so for more than one decade was not arbitrary and capricious, as the administrative record contained substantial evidence to support PURA's conclusion that a reduction in G Co.'s debt rate was necessary:

The evidence presented and examined by PURA provided a substantial basis from which PURA reasonably could infer that G Co. had sought an overrecovery of costs, that finding supported PURA's conclusion that an adjustment was necessary to ensure that the rates set by G Co. were, pursuant to § 16-19e (a) (4), "no more than sufficient" to allow G Co. to recover its costs, and PURA provided an adequate and full explanation in both its final decision and subsequent briefs for the reasons behind the change.

*(One justice dissenting)*

Argued September 8, 2023—officially released February 27, 2024

*Procedural History*

Appeal from the decision of the defendant reducing the plaintiff's proposed return on capital with respect to certain peaking generation facilities, brought to the Superior Court in the judicial district of New Britain, where the court, *Klau, J.*, granted the motion to intervene filed by the Office of Consumer Counsel; thereafter, the court, *Cordani, J.*, rendered judgment dismissing the appeal, from which the plaintiff appealed. *Affirmed.*

*Jennifer M. DelMonico*, with whom were *Marilyn B. Fagelson* and, on the brief, *Proloy K. Das* and *Daniel J. Sorger*, for the appellant (plaintiff).

*Seth Hollander*, assistant attorney general, with whom were *Scott Muska*, general counsel, and, on the brief, *William Tong*, attorney general, for the appellee (defendant).

*Thomas H. Wiehl*, staff attorney, with whom were *William E. Dornbos*, legal director, and, on the brief, *Jessica Gouveia*, staff attorney, for the appellee (intervenor Office of Consumer Counsel).

*Opinion*

McDONALD, J. This case concerns the authority of the defendant, the Public Utilities Regulatory Authority (PURA), to review and set the rates for peaking generation facilities within the state. The plaintiff, GenConn Energy, LLC, operates two peaking generation facilities, which are designed to provide additional electric energy to Connecticut consumers at times of increased demand. Each year, GenConn is required to submit an Annual Fixed Revenue Requirements (AFRR) application to PURA proposing the revenue that it believes is required to recover its allowed costs[1] and for it to receive a reasonable rate of return on equity. When GenConn submitted its 2021 AFRR application, PURA found, under the general rate-making principles of General Statutes § 16-19e, that GenConn sought to overrecover from electric ratepayers. As a result, PURA lowered GenConn's overall recovery of revenue to ensure that "the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs . . . ." General Statutes § 16-19e (a) (4).

On appeal to this court, GenConn argues that the trial court erred in concluding that PURA had acted within its authority. GenConn contends that PURA acted outside the scope of its authority under General Statutes § 16-243u, which specifically addresses peaking generation facilities, when it applied the general rate-making principles from § 16-19e in adjusting GenConn's recovery. GenConn also contends that PURA's change in methodology in evaluating the 2021 AFRR application was arbitrary and capricious. For its part, PURA contends that § 16-243u expressly affords it the authority to use the rate-making principles in § 16-19e, and, because it is statutorily obligated to review GenConn's recovery each year, its decision to lower GenConn's recovery was not arbitrary and capricious.[2] We conclude that § 16-243u authorized PURA to determine GenConn's recovery using the general rate-making principles found in § 16-19e and that the "change" in PURA's methodology does not constitute an arbitrary and capricious decision. Accordingly, we affirm the judgment of the trial court.

An overview of certain aspects of this state's electric supply industry and relevant statutes is necessary to understand the issues in this appeal. Historically, during times of peak demand, the state had to procure additional electricity from out-of-state providers to satisfy the demand of electric consumers within the state. See 50 S. Proc., Pt. 15, 2007 Sess., p. 5066, remarks of Senator Donald E. Williams, Jr. Importing electricity in this manner was expensive and resulted in higher prices for ratepayers year-round. See id. In 2007, in an effort to reduce electric rates for Connecticut consumers, the General Assembly passed No. 07-242 of the 2007 Public

Acts (P.A. 07-242), titled "An Act Concerning Electricity and Energy Efficiency" (act). The purpose of the act was to encourage investment in peaking generation facilities by assuring investors that they would recover their costs. See 50 S. Proc., supra, pp. 4960–62, remarks of Senator John W. Fonfara. By incentivizing the development of these peaking generation facilities, the state would not have to purchase out-of-state electricity at a premium, thereby reducing the cost of electricity for Connecticut ratepayers. See id., p. 5066, remarks of Senator Williams. Section 50 of P.A. 07-242 provides in relevant part that, "[f]rom January 1, 2008, until February 1, 2008, any person may . . . submit a plan to build peaking generation . . . to be heard in a contested case proceeding before the Department of Public Utility Control. . . ."[3] The act was later codified at General Statutes (Supp. 2008) § 16-243u, which provides that the selected peaking generators would fully recover the "prudently incurred costs" of the selected projects, including "capital costs, operation and maintenance expenses, depreciation, fuel costs, taxes and other governmental charges," as well as "a reasonable rate of return on equity." For the purposes of this opinion, the "prudently incurred costs" and the "reasonable rate of return on equity" referenced in § 16-243u will be referred to collectively as the "recoverable capital."

With this background in mind, we turn to the facts and procedural history specific to this case. In February, 2008, GenConn submitted a proposal to PURA with multiple options to construct peaking generation facilities. Included in the proposal were options to construct facilities in the Devon neighborhood of Milford and in Middletown. PURA ultimately selected GenConn to develop, finance, and construct both facilities. The Devon facility became operational in June, 2010, and the Middletown facility became operational in June, 2011. The initial capitalization for GenConn's facilities was 50 percent equity and 50 percent debt.[4] Then, in June, 2012, as required by PURA,[5] GenConn applied to refinance its outstanding debt, which at the time totaled $236.5 million. PURA approved the refinance, which had a coupon rate of 4.73 percent.[6] The interest expense for this refinancing is amortized and fixed each year from 2013 through 2041. The actual interest expense for the refinancing in 2021 was $8.573 million.

GenConn, as a peaking generation provider, is required to submit its AFRR application to PURA each year to set out the recoverable capital it seeks for the upcoming year. In determining the allowable recoverable capital, PURA first determines the rate base for the peaking generation facility. The rate base represents the total investment of the generation facility, or, in other words, the value of the property on which the facility is permitted to earn a rate of return. See Federal Energy Regulatory Commission, Cost-of-Service Rates Manual (1999) pp. 8–9, 15, available at https://www.ferc.gov/sites/default/

files/2020-08/cost-of-service-manual.pdf (last visited February 20, 2024). The rate base is then divided based on the debt-to-equity ratio to find the portion of the rate base that is attributable to each. In the present case, PURA and GenConn agreed that the 2021 rate base was $225.315 million, and, because GenConn had put forth a 50 percent/50 percent debt-to-equity ratio, the rate base for both debt and equity was approximately $112.658 million. The portion of the rate base that is attributable to debt and the portion that is attributable to equity are then multiplied by the applicable rate—in this case, GenConn sought a debt rate of 7.61 percent and an equity rate of 9.85 percent—to find the total amount the facility should be allowed to recover (recoverable capital).[7]

For each of GenConn's AFRR applications for 2010 through 2020, it sought and was allowed to recover, as part of the recoverable capital, its actual annual financing costs, which included interest on its long-term and short-term debt. When GenConn submitted its 2021 AFRR application, it sought to recover the $8.573 million actual interest expense for the 2021 refinancing. PURA disagreed that GenConn was entitled to recover the entire actual interest expense for 2021 and determined that a reduction was warranted.

PURA concluded that there were inaccuracies in both the debt-to-equity ratio and the debt rate proposed by GenConn. Regarding the debt-to-equity ratio, PURA found that GenConn had incorrectly determined its debt-to-equity ratio to be 50 percent/50 percent based on its internal balance sheets, when the actual ratio was closer to 75 percent/25 percent. PURA based this finding on the fact that GenConn was financing its rate base with a debt of $172.485 million rather than with $112.658 million, as indicated by the rate base. Regarding the debt rate, PURA found that, although GenConn's coupon rate on its debt was only 4.73 percent, GenConn was calculating the proposed debt rate using the actual interest owed, $8.573 million, which represented the interest on the $172.485 million in debt rather than on the $112.658 million. This resulted in the higher debt rate of 7.61 percent proposed by GenConn.

PURA determined that the effect of the miscalculations by GenConn in its proposal would result in approval of recoverable capital appropriate for a rate base of $285.143 million rather than the agreed $225.315 million rate base. The solution imposed by PURA was to keep GenConn's proposed 50 percent/50 percent debt-to-equity ratio but to reduce the debt rate from 7.61 percent to 5.07 percent,[8] ultimately reducing GenConn's recoverable capital by approximately $2.861 million. According to PURA, this result would be more in line with the recovery contemplated by § 16-19e (a) (4), in that the rates paid by customers would be "sufficient, but no more than sufficient," to cover GenConn's capital costs.

PURA therefore approved GenConn's AFRR application but only authorized a return on interest of approximately \$5.712 million rather than the \$8.573 million requested by GenConn. It is this reduction that is at issue in this appeal.

GenConn appealed PURA's final decision, claiming that PURA was not authorized to lower GenConn's debt rate. The trial court dismissed the appeal after concluding that PURA was authorized to adjust GenConn's overall recovery as it did. GenConn appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court. On appeal, GenConn asks this court to overturn the trial court's decision on the grounds that it violates the plain meaning of § 16-243u to allow PURA to consider the rate-making principles in § 16-19e and that PURA's change in methodology after more than one decade of evaluating GenConn's AFRR applications constituted an arbitrary and capricious decision.

Judicial review of an administrative agency's determinations is governed by the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., and is ordinarily restricted in scope, with the court's "ultimate duty" being to decide, "in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000). However, when a case presents a pure question of law, the court's review of the agency's decision is plenary. See, e.g., *1st Alliance Lending, LLC* v. *Dept. of Banking*, 342 Conn. 273, 280–81, 269 A.3d 764 (2022).

I

STATUTORY INTERPRETATION CLAIM

GenConn argues that the plain language of § 16-243u does not give PURA the authority to lower the recovery of GenConn's actual annual financing costs. It asserts that § 16-243u requires PURA to use "the specific rate-making methodology applicable to peaking generation set forth [in § 16-243u]" and not "the general rate-making principles found in . . . § 16-19e." PURA argues that the plain language of § 16-243u requires it to "review a peaking [generation] facility's capital costs in accordance with traditional regulatory principles, including those set forth in § 16-19e."

Whether § 16-243u authorizes PURA to utilize the rate-making principles set forth § 16-19e is a question of statutory interpretation. Because neither party in this case argues that PURA's interpretation has been time-tested or previously subjected to judicial scrutiny, "the traditional deference accorded to an agency's interpretation . . . is unwarranted," and, therefore, our review is plenary. (Internal quotation marks omitted.) *1st Alli-*

*ance Lending, LLC* v. *Dept. of Banking*, supra, 342 Conn. 280–81. Review of § 16-243u and the relevant statutory scheme must be in accordance with General Statutes § 1-2z and the familiar principles of statutory construction. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019). The meaning of § 16-243u must, "in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes." General Statutes § 1-2z.

Section 16-243u sets forth the law applicable only to peaking generation facilities and provides in relevant part that a peaking generation facility "shall only recover the just and reasonable costs of construction of the facility and, in an annual retail generation rate contested case, shall be entitled to recover its prudently incurred costs of such project, including, but not limited to, capital costs, operation and maintenance expenses, depreciation, fuel costs, taxes and other governmental charges and a reasonable rate of return on equity. *The authority shall review such recovery of costs consistent with the principles set forth in sections* 16-19, 16-19b and *16-19e*, provided the return on equity associated with such project shall be established in the initial annual contested case proceeding under this section and updated at least once every four years. . . ." (Emphasis added.)

Section 16-19e, which is expressly referenced in the text of § 16-243u, sets forth general rate-making principles applicable to all energy generators in this state. It provides in relevant part that PURA "shall examine and regulate . . . the establishment of the level and structure of rates in accordance with the following principles . . . (4) that the *level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs including*, but not limited to, appropriate staffing levels, and capital costs, to attract needed capital and to maintain their financial integrity . . . (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation . . . ." (Emphasis added.) General Statutes § 16-19e (a).

In short, § 16-243u provides in relevant part that a peaking generation facility "shall be entitled to recover its prudently incurred costs" and that "[t]he authority shall review such recovery of costs consistent with the principles set forth in sections 16-19, 16-19b and 16-19e . . . ." "As a general rule, [when] one statute specifically cites another statute, it is incorporating by reference the other statute, and the other statute must be considered in determining the plain language." 73 Am. Jur. 2d 251, Statutes § 13 (2023); see, e.g., *State* v. *Bemer*, 339 Conn. 528, 541–42, 262 A.3d 1 (2021) (when one statute explicitly referenced another, this court considered provisions of each in tandem to determine plain meaning under § 1-2z analysis). Section 16-243u incor-

porates § 16-19e by reference, and the plain meaning of § 16-243u must therefore be found by considering § 16-19e alongside it. In doing so, it is clear that § 16-243u directs PURA to review a peaking generation facility's recoverable costs to ensure that "the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs . . . ." General Statutes § 16-19e (a) (4).

GenConn argues that § 16-243u references § 16-19e only to the extent that PURA may consider the principles in the latter statute for the recovery of costs but not the setting of rates. We agree with PURA that such a distinction fails to consider the interrelated nature of cost recovery and rate setting. In the energy field, rates are "set at a level designed to recover the company's prudently incurred costs, plus an adequate return on investment." Report of the State Commission Practice & Regulation Committee, 30 Energy L.J. 765, 769 (2009). In other words, "[o]nce a [peaking generation facility] establishes its revenue requirement, the [facility] must then spread the revenue requirement to several established classes of ratepayers, and set rates, based on historical data, that the [facility] expects to generate its required revenue." *Commonwealth Edison Co.* v. *Illinois Commerce Commission*, 16 N.E.3d 713, 720 (Ill. App. 2014). GenConn's argument fails because a peaking generation facility recovers its costs through the setting of rates.

The plain meaning of § 16-243u, then, directs PURA to use the principles of § 16-19e in determining the generator's appropriate recoverable costs each year, and that amount is used to set the rates. To hold otherwise, as GenConn suggests—that PURA is authorized to look to § 16-19e only in determining the recovery of costs but must disregard that analysis in setting the rates—would lead to an absurd result. PURA determines the recoverable capital, which includes the recovery of costs and return on equity, in order to set the rates for the peaking generation facility. The facility can recover its costs only through the setting of rates. GenConn's interpretation of the statute would require PURA to determine the recoverable capital but then discard that number when setting the rates and instead set the rates using whatever costs had been deemed "prudently incurred" pursuant to § 16-243u. There would be no purpose, then, for PURA to determine the recovery of costs consistent with § 16-19e because it would serve no purpose in setting the rates. We decline to read the statutory scheme in a way that would lead to such an absurd result. See, e.g., *Raftopol* v. *Ramey*, 299 Conn. 681, 703, 12 A.3d 783 (2011) (court "construe[s] a statute in a manner that will not . . . lead to absurd results" (internal quotation marks omitted)).

Furthermore, GenConn's contention that PURA must

allow a full recovery of costs for any costs that were previously deemed "prudent," without any additional evaluation, would make the mandatory annual rate contested case required by § 16-243u meaningless. "It is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010). Section 16-243u provides in relevant part that there shall be an "annual retail generation rate contested case . . . ." It is this annual rate case that forecasts the recoverable costs for the upcoming year. If PURA had no power to review the recoverable capital at these annual rate cases and was merely required to allow recovery of any cost that had already been deemed prudent, there would be no purpose for the annual review. Moreover, such a construction would render the phrase in § 16-243u that "[t]he authority shall review such recovery of costs consistent with the principles set forth in [§] . . . 16-19e," meaningless. Because we presume that the legislature had a purpose behind every phrase it includes in a statute, we decline to conclude that the legislature deemed an annual review necessary but intended that PURA have no authority to make determinations about a peaking generation facility's recovery based on that review.

GenConn advances two additional arguments in support of its contention that PURA's decision violates the plain language of § 16-243u. First, GenConn argues that PURA's decision "illegally depriv[es] GenConn of its statutory right to recover prudently incurred costs." It reasons that, because PURA approved the 2012 refinancing of GenConn's debt as being in the best interest of consumers, the limitation set by § 16-243u, that only "prudently incurred costs" may be recovered, is fully satisfied.[9] GenConn asserts that PURA's decision to the contrary creates a bizarre result because costs that were already "deemed prudently incurred" in 2008 and 2012 can "be reevaluated and potentially recharacterized as not prudently incurred on an annual basis" and essentially "reads [the directives about prudently incurred costs and return on equity] out of the statute," making it meaningless legislation.

In its brief, PURA clarified that it does not dispute that the interest costs that GenConn incurred from the 2012 refinancing were prudent but that "[t]he relevant question is whether PURA is authorized to determine the prudently incurred capital costs [*that*] *may be recovered from consumers* . . . ." (Emphasis added.) In

other words, can a situation arise in which PURA deems a peaking generator's costs to be prudent at some point prior to the AFRR application, but then subsequently finds that the entire cost, though prudent, may nonetheless not be properly recovered from consumers? We conclude, based on the clear directives within § 16-243u, that PURA does have this authority. Section 16-243u sets out the categories of "prudently incurred costs" that the peaking generation facility is entitled to recover. It then explicitly states that this recovery of prudently incurred costs will be reviewed consistent with § 16-19e. See General Statutes § 16-243u. Therefore, although GenConn is correct in stating that § 16-243u allows it to recover its "prudently incurred costs," it ignores the subsequent sentence, which directs PURA to "review such recovery of costs" that may be recoverable from consumers according to § 16-19e. General Statutes § 16-243u.

Second, GenConn argues that PURA's decision violates the plain language of § 16-243u by preventing it from recovering a reasonable rate of return on equity. Section 16-243u provides in relevant part that a peaking generation provider "shall be entitled to recover . . . a reasonable rate of return on equity. . . ." The statute further provides in relevant part that the return on equity "shall be established in the initial annual contested case proceeding under this section and updated at least once every four years. . . ." General Statutes § 16-243u. The rate of return on equity proposed by GenConn and accepted by PURA for 2021 was 9.85 percent. GenConn argues that PURA, by disallowing some of GenConn's recovery of costs, reduced the rate of return on equity to less than 9.85 percent because GenConn now must "absorb the $2.861 million in direct costs that should have been recovered," resulting in "an effective rate of return [on equity] of 7.59 [percent] . . . ." This argument is unpersuasive. The rate of return on equity was not lowered by PURA. It is true that GenConn's recoverable capital is lower than what it requested in its AFRR application by a total of $2.861 million, but this is a result of a reduction in the debt rate. The rate of return on equity remains 9.85 percent, which, when multiplied by the portion of the rate base designated as equity ($112.658 million), totals a return of approximately $11 million. Simply because GenConn's overall recoverable capital was lowered as a result of the reduction in the debt rate does not mean that the return on equity has been altered. See, e.g., *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 312, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989) (discussing rate of return on equity as separate and distinct from total overall return and noting that rate of return on equity can be one figure, while "overall return" may be lower one). PURA did not violate the plain language of § 16-243u because it allowed a reasonable rate of return on equity pursuant to the same rate of return that pre-

viously had been agreed on by the parties.

PURA and the Office of Consumer Counsel (OCC) also point out, and we agree, that GenConn's interpretation, if applied, would leave PURA powerless to fix excess recoveries, which would conflict with not only the plain meaning of § 16-243u, but also with the broad authority granted to PURA in § 16-19e to set rates. The OCC emphasizes the importance of PURA's "flexibility" in examining an AFRR application and notes that PURA must be able to do so "in light of the entire universe of facts and circumstances available to it . . . ." (Footnotes omitted.) PURA is "[statutorily charged] with ensuring that Connecticut's [investor owned] utilities, including the state's electric . . . companies, provide safe, clean, reliable, and affordable utility service and infrastructure." Public Utilities Regulatory Authority, Dept. of Energy & Environmental Protection, About PURA (2024), available at https://portal.ct.gov/PURA/About/About-PURA (last visited February 20, 2024). It is for this reason that § 16-243u directs PURA to review the peaking generation facility's recovery of costs consistent with § 16-19e to ensure that "the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs . . . ." General Statutes § 16-19e (a) (4). Given this clear purpose, PURA must be able to protect the interests of ratepayers, and, when it determines that a company is overrecovering, it must be allowed to adjust the rates. Furthermore, this court has repeatedly held that PURA has broad authority to regulate electric utilities and to set rates. See, e.g., *Greenwich* v. *Dept. of Public Utility Control*, 219 Conn. 121, 126, 592 A.2d 372 (1991) ("[PURA's] enabling statute . . . evinces a legislative intent to rely on [PURA] to regulate and supervise public utilities, and to establish rates that are not unreasonable. . . . [W]e conclude that the language of the enabling statute is sufficiently flexible to permit [PURA] to create necessary policies, including rate equalization, to guide its rate-making decisions." (Footnote omitted.)). Indeed, the United States Supreme Court has repeatedly emphasized the importance of the discretion afforded to regulatory agencies. See, e.g., *Duquesne Light Co.* v. *Barasch*, supra, 488 U.S. 313 ("[w]e have never doubted that state legislatures are competent bodies to set utility rates"); *Minnesota Rate Cases*, 230 U.S. 352, 433, 33 S. Ct. 729, 57 L. Ed. 1511 (1913) ("[t]he rate-making power is a legislative power and necessarily implies a range of legislative discretion"); see also, e.g., *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968) (discussing broad responsibility given to regulatory agency and stating that "it must be free, within the limitations imposed by . . . statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests"). We see no reason, given the importance and purpose of PURA's

regulatory authority, to change course now.

Accordingly, we conclude that PURA was within its authority afforded by § 16-243u to review GenConn's requested recovery of costs and to adjust the debt rate, thereby lowering GenConn's return on financing costs.[10]

## II

### ARBITRARY AND CAPRICIOUS CLAIM

GenConn also contends that PURA's 2021 decision was "arbitrary and capricious" because it changed the methodology PURA had used for one decade in determining recovery for peaking generation facilities. In response to this contention, PURA explains that it first discovered GenConn's "rate-making artifice," which had led to one decade of overrecovery, in 2021. PURA argues that, after this discovery, it "fixed the problem" by adjusting GenConn's recovery to reflect "the just and reasonable capital costs allowable under traditional rate-making principles."

GenConn's claim that PURA's decision was arbitrary and capricious requires this court to determine whether there is "substantial evidence in the administrative record to support [PURA's] findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, supra, 254 Conn. 343. "An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Commissioner of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 347 Conn. 675, 708, 299 A.3d 197 (2023). When an agency "has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations [that] the [agency] was required to apply under the . . . regulations." (Internal quotation marks omitted.) *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, 257 Conn. 456, 470, 778 A.2d 61 (2001).

We conclude that there is substantial evidence in the record to support PURA's final decision. The evidence presented and examined by PURA—the actual coupon rate of GenConn's debt, the agreed on rate base, the agreed on debt-to-equity ratio, and the actual debt-to-equity ratio as supported by GenConn's balance sheets—provides a substantial basis from which PURA reasonably inferred that GenConn sought an overrecovery of costs. See part I of this opinion. PURA's finding, in turn, supported its conclusion that an adjustment was necessary to ensure that the rates set by the agency were "no more than sufficient" to allow GenConn to recover its costs. General Statutes § 16-19e (a) (4). The evidence examined by PURA and reflected in the administrative

record provides substantial support for both its findings of fact and subsequent action in lowering the debt rate.

Furthermore, PURA's "change in methodology" is not a failure to abide by its own rules but, rather, an attempt to protect ratepayers from bearing the financial burden of GenConn's overrecovery. PURA failed to notice the overrecovery that GenConn had benefited from in prior years by incorrectly increasing its debt rate, and, once PURA discovered the issue, course corrected. Moreover, even if we were to consider this change to be a failure by PURA to follow its own rules, PURA provides an adequate and full explanation in both its final decision and subsequent briefs for the reasons behind the change. See *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, supra, 257 Conn. 459–60. As such, PURA's action in lowering the debt rate after one decade of neglecting to do so can in no way be said to be arbitrary and capricious. See id., 470, 479–80. Rather, it avoids an unjust windfall on the part of GenConn at the ratepayers' expense.

## CONCLUSION

The trial court correctly determined that PURA acted within its statutory authority to lower GenConn's debt rate in its 2021 AFRR decision. Specifically, we conclude that PURA acted pursuant to its authority under § 16-243u when it reviewed GenConn's recovery of costs consistent with the general rate-making principles of § 16-19e. We also conclude that, because the administrative record contains substantial evidence to support PURA's conclusion that a reduction in the debt rate was necessary, its decision does not constitute an arbitrary and capricious one.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and D'AURIA, MULLINS, ALEXANDER and MOLL, Js., concurred.

[1] The allowed recoverable costs include the projected capital costs, operations and maintenance costs, and administrative and general expenses. Capital costs include the cost of debt. See, e.g., *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944).

[2] The Office of Consumer Counsel (OCC) is an intervenor in this matter and, as such, filed a brief in this appeal. The OCC is an independent government agency designated by statute as the advocate for all consumers of the state's regulated electric, natural gas, water, and telecommunications utilities, as well as the customers of electric suppliers. See General Statutes § 16-2a (a). Section 16-2a (a) authorizes the OCC "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved . . . ." Unless otherwise noted, the arguments made by the OCC largely track those of PURA.

[3] The Department of Public Utility Control is PURA's predecessor. See Public Acts 2011, No. 11-80, § 1; see also, e.g., *Kleen Energy Systems, LLC* v. *Commissioner of Energy & Environmental Protection*, 319 Conn. 367, 370 n.1, 125 A.3d 905 (2015). For convenience, we hereafter refer to the Department of Public Utility Control as PURA.

[4] The "capitalization" or "capital structure" is a representation of how the facility has financed its investment. Federal Energy Regulatory Commission, Cost-of-Service Rates Manual (1999) p. 15, available at https://www.ferc.gov/sites/default/files/2020-08/cost-of-service-manual.pdf (last visited February 20, 2024). It is represented as a ratio of debt to equity. See id. "For example, a [generator that] has financed its investment with $6 million debt and $4

million in common equity, is referred to as having a 60 [percent]/40 [percent] debt-equity capitalization ratio." Id. "A utility's capital structure is used as a basis in determining the overall rate of return on a utility's investment." *In re Zia Natural Gas Co.*, 128 N.M. 728, 731, 998 P.2d 564 (2000).

[5] PURA's criteria decision, which established the criteria that would be used to "evaluate the proposals" to build the peaking generation facilities, provides that all refinancings sought by a peaking generation facility "will be required to be approved by [PURA]."

[6] The coupon rate is the fixed interest rate of the loan.

[7] In the AFRR decision, PURA accepted GenConn's proposed rate of return on equity of 9.85 percent. In its decision, PURA stated that, "[p]ursuant to the [2007 criteria decision], GenConn is permitted a [return on equity] determined by the average of The Connecticut Light and Power Company's (Eversource Energy) and The United Illuminating Company's (UI) currently allowed [return on equities] plus 67.5 basis points. Neither Eversource Energy nor UI [has] had a rate proceeding since the 2020 AFRR [application]; hence, the [return on equity] base remains the same. Specifically, Eversource Energy has a [return on equity] of 9.25 [percent], and UI has a [return on equity] of 9.10 [percent]. The resulting average [return on equity] of 9.175 [percent] is added to 67.5 basis points for a total of 9.85 [percent]."

[8] PURA found the 5.07 percent debt rate to be the "all-in cost of debt," explaining that this rate "accounts for the coupon rate of GenConn's long-term debt, recoverable fees and costs, and interest from short-term letter of credit (LOC) debt."

[9] The dissent, accepting GenConn's invitation, also argues that the language of § 16-243u "indicates a mandatory entitlement" to recovery of GenConn's prudently incurred costs. As we explained in part I of this opinion, the relationship between §§ 16-243u and 16-19e is essential to understanding what power PURA has to adjust GenConn's recovery of costs. The language of § 16-243u directs PURA to review the recovery of prudently incurred costs consistent with the principles of § 16-19e, which, in turn, gives PURA the authority to set rates so that they are "no more than sufficient" to allow GenConn to "cover [its] operating costs . . . ." General Statutes § 16-19e (a) (4).

[10] The dissent maintains that PURA was authorized to adjust GenConn's recovery through other mechanisms available to it. We note that we agree, as does PURA, that PURA likely could have reduced GenConn's recovery even more than it did in this case. Specifically, as the dissent suggests, PURA could have reduced GenConn's recovery by adjusting the debt-to-equity ratio and the debt rate. Such adjustments would have resulted in a recovery of around $14 million for GenConn, a recovery that is approximately $5.6 million less than that which was originally requested. Our disagreement with the dissent lies in its reading of § 16-243u as precluding PURA from adjusting the cost of debt to disallow an overrecovery, which we found to be an authorized action.